# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
## CASE NO. 06-22197-CIV-COOKE/BROWN

LEONIDAS DOWLEN,

     Plaintiff,

v.

R. JAMES NICHOLSON,

     Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant's Motion for Summary Judgment [D.E. 42],

filed on June 29, 2007. The Court has carefully reviewed the motion, response, reply and attached

exhibits. For the reasons set forth below, the Court finds that Plaintiff did not proffer sufficient

evidence to create a genuine issue of material fact as to whether each of Defendant employer's

articulated reasons for discharging Plaintiff is pretextual. Defendant is, therefore, entitled to

summary judgment on Plaintiff's claim.

## I. BACKGROUND[1]

Leonidas Dowlen ("Dr. Dowlen") instituted this action, alleging violations of the Age

Discrimination in Employment Act ("ADEA") of 1967, as amended by 29 U.S.C. § 621, et seq. Dr.

Dowlen was hired by the Miami Veterans Administration Hospital ("hospital" or "Miami VA") on

---

[1] *See* Defendant's Statement of Undisputed Material Facts [D.E. 42 at pp. 1-12] and Plaintiff's Statement of Material Facts [D.E. 48]. Under Local Rule 7.5, all material facts set forth in the statement served by the moving party are deemed admitted unless controverted by the opposing party's statement, provided that the movant's statement is supported by evidence in the record.

August 8, 2004, as an Assistant Urology Physician.  He was sixty-one years old when he was hired. *See* Dowlen Dep. at 107.  Dr. Dowlen interviewed with several doctors before the Chief of Staff, Dr. John Vara, approved the recommendations of others that he be hired.  *See* Furst Dep. at 12-13.  Dr. Dowlen first met with the Chief of Surgery and then with Dr. Kava, who was the Chief of the Urology Department.  *Id.*  Thereafter, Plaintiff was employed as an "excepted appointment" for a two-year term.  He was considered a probationary employee during that term.  The term was scheduled to end August 15, 2006, but could be renewed.

The Miami VA Urology Department falls under the Miami VA Surgical Department.  The Chief of Surgery is Dr. Seth Spector.  Dr. Bruce Kava, an employee of the University of Miami, heads the Urology Department.  The Miami VA has a contract with the University of Miami to staff the Urology Department of the hospital.  Many of the Miami VA attending doctors at the Urology Department are employees of the University of Miami, but not all.  The Miami VA hired Dr. Dowlen.

Additionally, the Miami VA does not normally hire a doctor without the concurrence of the Urology Department at the University of Miami.  *Id.*  Therefore, Dr. Dowlen also interviewed with Dr. Mark Soloway from the University.  After an applicant met with these individuals, he would either be informally recommended to the Chief of Staff or the Chief of Staff would receive the applicant's curriculum vitae and then meet with the candidate.  *Id.*  Ultimately, the Chief of Staff decided whether or not to hire a candidate.  *See* Dowlen Dep. at 105.  Nevertheless, the Chief of Staff customarily hired physicians recommended to him.  *See* Furst Dep. at 11.

After Dr. Dowlen received an offer of employment, he worked part-time for the first three months and then began working full-time.  During his tenure as a part-time employee, he assisted

and supervised residents during urology surgery.  As a full-time employee, Dr. Dowlen worked

Monday through Thursday in the Urology Clinic and, on Fridays, he performed cystoscopies using

local anesthesia.  *See* Dowlen Dep. at 14.  On Mondays, he worked at the clinic with the residents.

*Id.*  On Tuesdays through Thursdays, he would see patients in the clinic with with the help of a

Physician's Assistant.  *Id.* at 15-18.  On Thursdays, he also performed prostatic biopsies.  *Id.* at 14.

On June 21, 2006, Dr. Dowlen was advised that his appointment would not be renewed.  On

July 12, 2006, Dr. Dowlen was given a letter of termination advising him that he would be

terminated July 28, 2006, which was approximately two weeks earlier than his scheduled term end

date of August 15, 2006.  Dr. Dowlen was sixty-three years old at the time.  *See* Dowlen Dep. at 107.

Within the Department of Surgery, there are doctors who are as old or older than Dr. Dowlen.  *See*

Kava Dep. at 94.  When deposed by an Equal Employment Opportunity investigator, the Chief of

Staff stated that he did not know Dr. Dowlen's exact age, but that he is aware that Dr. Dowlen is

slightly older than him.  *See* Vara EEO Aff. at 4.

### A.    *THE TERMINATION PROCESS*

When the Chief of Surgery, Dr. Spector, decided to terminate Dr. Dowlen's employment, he

discussed the matter with the Chief of Staff, Dr. Vara.  *See* Spector Dep. at 7.  Dr. Spector did not

have the sole decision-making authority to terminate Dr. Dowlen.  *Id.*  Only Dr. Vara has the final

authority to terminate members of the hospital's medical staff.  *Id.* at 8.  The decision to terminate

Dr. Dowlen was, therefore, a result of an ongoing discussion between Dr. Spector and Dr. Vara.  *Id.*

Ultimately, Dr. Spector recommended that Dr. Dowlen be terminated and Dr. Vara approved that

recommendation.  *Id.*

Dr. Vara did not do any independent investigation to confirm the basis for Dr. Spector's

recommendation to terminate Dr. Dowlen. *See* Vara Dep. at 53. One of the discussions between Dr. Spector and Dr. Vara concerned the inadequacy of Dr. Dowlen's notes. *Id.* at 54. Although Dr. Spector reported to Dr. Vara that Dr. Dowlen's notes were deficient, Dr. Vara only saw one or two examples of the deficient notes. *Id.*

Dr. Vara did, however, obtain information about Dr. Dowlen's performance from Dr. Spector. *See* Vara EEO Aff. at 15. Together, they reviewed a general summary of Dr. Dowlen's actions. *Id.* Dr. Vara requested data regarding Dr. Dowlen's productivity and the quality of his records. *See* Vara EEO Aff. at 15. Although Dr. Vara requested and reviewed data on Dr. Dowlen's performance, it seems that Dr. Vara did not review any competency evaluations on Dr. Dowlen. A competency evaluation may have been performed on Dr. Dowlen at some point, since they are usually performed every one to two years, but Dr. Spector did not complete one for him. *See* Spector Dep. at 8.

Dr. Vara also wanted to ensure that Dr. Dowlen had been notified several times by Dr. Spector about his deficiencies before he was terminated. *See* Vara EEO Aff. at 15. According to Dr. Vara, Dr. Spector met with Dr. Dowlen a couple of times by fall 2005 to discuss his low productivity and inadequate notes. *Id.* at 8; *see also* Vara Dep. at 57. Dr. Dowlen asserts, however, that he did not have any conversations with Dr. Spector in 2005 concerning the number of patients he was to see or the number of cystoscopies he needed to perform. *See* Dowlen Dep. at 112. According to Dr. Dowlen, he first began having conversations with Dr. Spector regarding those issues in February 2006. *Id.*

Dr. Dowlen further asserts that Dr. Kava, the Chief of Urology, never mentioned to him that his patient notes were insufficient. *See* Dowlen Dep. at 102. Dr. Dowlen also does not recall ever

4

talking to Dr. Kava about the number of cystoscopies he was performing.  *Id.* at 11.  Dr. Kava, however, did discuss with Dr. Dowlen, either in late 2004 or in 2005, that he was ordering lab work excessively.  *Id.* at 10.

Dr. Dowlen was never told that he needed to see a certain number of patients until February 2006 when Dr. Spector approached him.  *Id.* at 12.  The Miami VA Medical Center Primary Care/Urology Service Agreement does not state the number of patients that a physician is expected to see daily.  *See* Pl.'s Ex. 6, Service Agreement.  Furthermore, Dr. Brian Cohen, a medical resident, was never told how many patients he was expected to see on a daily basis.  *See* Cohen Dep. at 25. Dr. Dowlen was also never told that he would be terminated if he did not increase the number of patients he treated daily.  *See* Spector Dep. at 51.

Before he was terminated, Dr. Dowlen had either improved or had said he would improve in certain areas where he was deficient.  For example, his typing skills improved.  *See* Dowlen Dep. at 71.  He also told Dr. Spector that, although he did not think he could, he would try to see more patients.  *See* Spector Dep. at 45.  There were also a handful of days where Dr. Dowlen saw eighteen or more patients in one day.  *See* Dowlen Dep. at 125.  He thinks this was a result of improved scheduling.  *Id.* at 126.

## B.    DR. DOWLEN'S REPLACEMENT AND AGE RELATED COMMENTS

Dr. Dowlen was temporarily replaced by Dr. Tony Lawongo, who is in his thirties.  *See* Spector Dep. at 15.  The Miami VA hired Dr. Victoria Bird, who is also in her thirties, to permanently replace Dr. Dowlen.  *Id.*  These doctors are approximately thirty years younger than Dr. Dowlen.

Additionally, Dr. Dowlen was told by Dr. Rene Rodriguez, the Chief of Orthopedics, that Dr.

Spector only wants young doctors and wants to get rid of the older doctors. *See* Dowlen Dep. at 165. Dr. Spector also testified at deposition that he might have told Dr. Dowlen that he was too fixed in his ways. *See* Spector Dep. at 92.

###    C.    *ADVANCED CLINIC ACCESS*

The Miami VA formulates expectations in regard to the number of patients their physicians should see by using community comparisons. *See* Vara Dep. at 23. In Broward County, a physician comparable to Dr. Dowlen sees approximately thirty percent more patients than Dr. Dowlen. *Id.* at 22. Broward County had already implemented Advanced Clinic Access, which is a system that tries to improve the number of patients that show up for scheduled appointments. *Id.* at 62-63. At the time that Dr. Dowlen was being evaluated, the hospital was in the process of implementing the system. *Id.* at 63.

Dr. Vara believes Dr. Dowlen saw approximately eight to twelve patients per day. *Id.* at 23. A registered nurse at the clinic testified at deposition, however, that Dr. Dowlen saw the patients that were scheduled. *See* Toledo Dep. at 57. Nevertheless, Dr. Dowlen admits that he cancelled patient's appointments, but asserts it was for the patient's own health that these appointments were cancelled. *See* Dowlen Dep. at 125. Dr. Dowlen asserts that when he would perform cystoscopies on Fridays, he would perform the procedure on every scheduled patient who was ready and whose health was appropriate for the procedure. *Id.* at 124-25. Dr. Dowlen found that, generally, five patients fit this criteria. *Id.* He asserts that he only cancelled cases when it was necessary and tried to reschedule patients for earlier appointments when he noticed openings in the schedule. *Id.* at 124. Dr. Dowlen was not able to state the approximate number of patients he was seeing, but did state that the numbers were increasing. *Id.* at 126.

Before Dr. Dowlen was hired, a scheduling problem already existed in the Urology Department. *See* Spector Dep. at 58. Dr. Dowlen was hired to address the backlog at the clinic. *See* Vara Dep. at 12. Since the Plaintiff's termination, the Miami VA implemented advanced clinic access, which has changed the process of scheduling to allow patients to choose the date of their appointment. *See* Spector Dep. at 60-61. Thus, more patients show up for their appointment, thereby improving the scheduling. *Id.* at 61. Before Dr. Dowlen was terminated, he told Danny Toledo, a registered nurse at the clinic, that they had to work to implement advanced clinic access to improve the patient numbers in the urology clinic. *See* Toledo Dep. at 49.

### D.   DEFENDANT'S REASONS FOR DECLINING TO RENEW PLAINTIFF'S APPOINTMENT

Defendant contends that there were several complaints about Dr. Dowlen that were brought to the attention of the Chief of the Urology Department, the Chief of the Surgical Department, and the Chief of Staff. These complaints were made by nurses at the urology department, surgical nurses, resident doctors, and laboratory staff. *See* Mot. Summ. J. at 3.

### 1.   UROLOGY CLINIC

Dr. Dowlen was an attending physician at a very busy clinic. *See* Spector Dep. at 58. Dr. Spector, the Chief of Surgery, stated at his deposition that Dr. Dowlen had been hired to increase the number of patients that the clinic was able to see and to shorten the wait time for patients. *Id.* He also stated that Dr. Dowlen was unable to do that. *Id.* at 101.

Dr. Dowlen was expected to see twenty patients per day. *See* Kava Dep. at 16. Dr. Kava, the Chief of Urology, would see fifty to sixty patients per day. *Id.* Dr. Dowlen, however, was unable to see twenty patients per day even though he had the help of a Physician's Assistant. *Id.* Dr. Kava

originally planned on giving the Physician's Assistant administrative duties but, because Dr. Dowlen was off-loading his patients on her, she did not have time to complete administrative tasks. *Id.* at 90. Between Dr. Dowlen and the Physician's Assistant, they were able to see twelve to fourteen patients on Tuesdays and Wednesdays. *See* Dr. Dowlen Dep. at 16. These were days when Dr. Dowlen did not have to work with residents or perform prostatic biopsies or cystoscopies. *Id.* at 14-16. Dr. Dowlen testified at deposition that Dr. Kava told him that he, with the help of the Physician's Assistant, should see fifteen patients per day. *Id.* at 12. Dr. Dowlen further testified that he thought that was reasonable. *Id.*

One urology nurse practitioner at the clinic testified at deposition that she would see six new patients, three days per week by noon. *See* Silbert Dep. at 54. On the two days per week that she did follow-ups, she was able to see ten to twelve patients by noon. *Id.* She, therefore, opined that it would be very reasonable to see twenty patients per day between two people, especially because not all of the scheduled patients showed up for their appointment. *Id.*

Dr. Dowlen's patients had long wait times. *See* Kava Dep. at 17. Those patients that he did see were happy with his services because they would receive much attention during their visit. *Id.* The other patients, however, were not seen at their scheduled time and sometimes spent two hours in the waiting room. *Id.* The Chief of Urology felt that Dr. Dowlen was not able to live up to the Urology Department's responsibilities to its patients. *Id.* at 14. Patients and nurses were complaining about how the clinic was running and about the patients' long wait times. *Id.* at 18.

## *2. CYSTOSCOPIES*

On Fridays, Dr. Dowlen would perform cystoscopies.[2] Jodi Rhoda, the surgical coordinator of the Urology Department, was instructed to schedule ten cystoscopies per day for Dr. Dowlen, but he typically never performed that many either because the procedure was cancelled or rescheduled because Dr. Dowlen did not think the patients were ready.[3] *See* Rhoda Dep. at 5; Silbert Dep. at 48. It was a normal expectation for a urologist at the clinic to perform ten cystoscopies in one day and to see twenty patients per day on other days. *See* Rhoda Dep. at 8. Although the ten cystoscopies were scheduled, Dr. Dowlen would often complete only four. *See* Kava Dep. at 37. Dr. Dowlen would cancel the procedure because the patient did not have a urine culture or, in other instances, because the patient did not have a CAT scan. *Id.* at 40. According to the Chief of Urology, these tests were not routine for cystoscopies. *Id.* Furthermore, other residents and attendings did not experience difficulty performing the expected number of cystoscopies.[4]

Danny Toledo, a registered nurse, stated, however, that Dr. Dowlen ordered new lab results

---

[2] A cystoscopy is a procedure performed under local anesthesia. *See* Cohen Dep. at 29. The local anesthesia is a lubricant jelly. *Id.* A device is then inserted into the bladder through the urethra for the purpose of examining the bladder. *Id.* at 30. The procedure takes three to five minutes. *Id.* If something suspicious is detected, a second procedure is scheduled and performed under general anesthesia or spinal anesthesia. *Id.* at 32.

[3] Dr. Dowlen notes that Ms. Rhoda worked on the eighth floor while he worked on the first floor of the urology clinic. *See* Toledo Dep. at 58-59.

[4] According to the transcript filed with the Court, Ms. Rhoda, who is the surgical coordinator of the Urology Department, first states that the other attendings and residents were not capable of meeting the number of patients that the VA wanted Dr. Dowlen to see. *See* Rhoda Dep. at 24:2-7. Upon further questioning, however, it appears that the deponent's testimony is to the contrary, and that she intends to state that the other attendings or residents did not have the same level of difficulty that Dr. Dowlen experienced with the numbers of patients. *Id.* at 24:8-11.

on a patient when they were too old for him to safely rely on them.  *See* Toledo Dep. at 37.  Due to the backlog, patients' lab results became stale, so Dr. Dowlen required the patient to get new lab work done.  *Id.*  Members of the urology staff were not making sure that patients had the proper lab results before they were scheduled for procedures.  *See* Dowlen Dep. at 124.

The cystoscopy nurses also complained about Dr. Dowlen to the Chief of Surgery and the Chief of Urology.  *See* Delgado Dep. at 8.  There were problems with operating rooms running late, finding nurses to stay late because procedures were not finished on time, and nurses finding it difficult to work with Dr. Dowlen.  *Id.*  Dr. Dowlen's inability to stay on schedule created uncertainty and frustration amongst the staff that tried to keep an orderly schedule.  *See* Silbert Dep. at 18-19, 48.  One of the registered nurses, Hector Delgado, also thought that Dr. Dowlen was unsure of himself while performing flexible cystoscopies using the hospital's technology.  *See* Delgado Dep. at 15.  Nurse Delgado believed that Dr. Dowlen performed some flexible cystoscopies that should have been stopped because the patient was in too much pain.  *Id.* at 31.

If the physician who performs the flexible cystoscopy reports finding a visual lesion, the patient is brought back for a procedure with anesthesia where they undergo a resection of a bladder tumor or a biopsy under anesthesia.  *Id.* at 40-41.  There were times when Dr. Dowlen reported a visual lesion that was followed-up by another attending who found that there was no lesion.  *Id.*  As a result, unnecessary biopsies were being conducted, which posed risks associated with anesthesia and the risk of infection.  *See* Kava Dep. at 86.

### 3.   *LABS*

The Miami VA has a laboratory that serves the entire Miami VA.  Dr. Dowlen demanded that urinalysis at the out-patient urology clinic be treated the same as laboratory requests from the

emergency room or from the intensive care units.  Dr. Dowlen expected that laboratory results be delivered to him as STAT.[5]  *See* Dowlen Dep. at 204.  STAT labs are normally ordered by the emergency room and by the surgical and medical intensive care units.  *See* Gonzalez Dep. at 32-34.  Furthermore, Dr. Dowlen sought priority over others at the lab.  *Id.* at 14.  Dr. Dowlen's demands that his out-patient urology clinic patient results be treated as STAT negatively impacted actual STAT orders.  *Id.* at 32-34.  As a result, laboratory staff began complaining about Dr. Dowlen. The Laboratory Manager wrote a memorandum summarizing the staff's complaints.  *See* Gonzalez at 18-19; Ex. J, memorandum.  Afterward, the Chief of Pathology and Laboratory Service, the Laboratory Manager, and someone from Quality Management met with the Chief of Urology to discuss the problems the laboratory was experiencing with Dr. Dowlen.  *See* Gonzalez at 19.  The contents of the memorandum, however, was never communicated to Dr. Spector, the Chief of Surgery.  *Id.*

After Dr. Dowlen's employment was terminated, the lab purchased a new urinalysis machine. *See* Gonzalez Dep. at 23-24.  Since the purchase of the new machine, the process of obtaining lab results has sped up considerably.  *Id.* at 7, 24.  The process is still not as efficient as it could be, however, given that people still have to carry patient samples to the lab for testing.  *Id.* at 8.

### 4.   *SURGERY*

Dr. Dowlen performed surgeries and supervised residents performing urological surgery when he started working at the VA hospital.  A few months after his probationary period, Dr. Dowlen told the Chief of Surgery and Chief of Urology that he did not want to perform surgeries or endure the stress of surgery.  *See* Spector Dep. at 90; Kava Dep. at 80, 84-85.  He said he was losing

---

[5]     According to Dr. Dowlen, lab results ordered as STAT were only supposed to take sixty minutes to process.  *See* Dowlen Dep. at 82.

sleep and had anxiety stemming from surgery.  *See* Kava Dep. at 85.  Dr. Dowlen stopped working

on cases in the operating room that required anesthesia.  *See* Cohen Dep. at 11.  Other attendings

were performing the type of surgical procedures that Dr. Dowlen would not perform.  *See* Delgado

Dep. at 40.

### 5. *WORKING WITH RESIDENTS*

The residents of the University of Miami Medical School met with the faculty of the medical

school to complain about Dr. Dowlen.  *See* Kava Dep. at 52.  Residents complained that Dr.

Dowlen's methods were not the same ones that they had learned at medical school, and that they

were antiquated.  *See* Delgado Dep. at 14; *see also* Carmack Dep. at 14.  The Chief Resident

expressed his concerns to the Chief of the Urology Department about performing procedures

requiring anesthesia on patients based on Dr. Dowlen's recommendations.  *See* Cohen Dep. at 11-12.

His concerns stemmed from the lack of clarity in Dr. Dowlen's cystoscopy notes.  *Id.* at 34; *see also*

Carmack Dep. at 8, 11, 14.

There were multiple complaints about Dr. Dowlen's medical notes.  The Chief of Surgery,

the Chief of Urology, resident-doctors, and the cystoscopy nurse complained that Dr. Dowlen's notes

were difficult to follow.  *See* Spector Dep. at 37, 41-42; Kava Dep. at 87; Carmack Dep. at 8, 11, 14;

Rhoda Dep. at 17.  One doctor stated: "It was nearly impossible sometimes to determine what he

actually saw during the cystoscopy based on his dictated notes."  *See* Cohen Dep. at 14.  This

particular doctor did not convey his criticism directly to Dr. Dowlen.  *Id.* at 12.

Dr. Dowlen had a poor working relationship with the residents.  *See* Kava Dep. at 89.  There

were residents that did not want to work with him.  *Id.*  One nurse practitioner described the

relationship between Dr. Dowlen and the residents as involving "a lot of friction."  *See* Silbert

Dep. at 52.  The Chief of Urology "would try to be an intermediary."  *Id.*

### *6.  NURSES*

The nurses would complain that working with Dr. Dowlen was a source of stress for them. *See* Rhoda Dep. at 23; Silbert Dep. at 32-33.  Nurses complained to the Chief Nurse.  *See* Delgado Dep. at 11.  The Chief Nurse stated at deposition: "Almost anybody that I assigned back there to work with him would notify me that it was difficult to work with him . . . ."  *Id.*  Dr. Dowlen appeared to the nurses to be excited, nervous, and stressed.  *See* Rhoda Dep. at 22-23.  One nurse stated that Dr. Dowlen ". . . would say a lot of incomplete sentences and scattered thoughts . . . ." *Id.* at 23.  One nurse complained that ". . . it was difficult to follow what it was he wanted you to do because you would try to do it, and then something else would come up."  *See* Silbert Dep. at 20. The same nurse further stated: "And he, he was impossible to follow.  I didn't understand what it is he wanted me to do.  Get an antibiotic, do this, do that.  Then he would tell Danny, me, Jodi and Darly the same thing.  All of us would stop what we were doing to try to help him."  *Id.* at 32-33.

### *II.  LEGAL STANDARD*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  According to the U.S. Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

13

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. . . [o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "'may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1984) (stating "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court, however, must view the evidence in the light most favorable to the nonmoving party, and summary judgment is inappropriate where a genuine issue of material fact remains. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Furthermore, the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied. *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1140 (11th Cir. 2007) (citing *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

### III. DISCUSSION

ADEA plaintiffs must establish a prima facie case of discrimination. *Chapman v. AI Transport*, 229 F.3d 1012,1024 (11th Cir. 2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997)). To do so, a plaintiff can show that "he (1) was a member of the

14

protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual." *Id.* (citing *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207-08 (11th Cir. 1997)).  Once the plaintiff establishes a prima facie case of age discrimination, there is a presumption that the employer discriminated against the employee that the employer must rebut to avoid losing on summary judgment. *Id.* (citing *Combs*, 106 F.3d at 1528).

To rebut the presumption, the employer must provide a non-discriminatory reason for the adverse employment action. *Id.*  Once the employer does so, the presumption of discrimination is defeated. *Id.*  At this point, the plaintiff must come forward with evidence that allows a reasonable factfinder to conclude that the reasons given by the employer for the adverse employment action were pretextual. *Id.*  If the plaintiff fails to proffer such evidence, the employer is entitled to summary judgment on the plaintiff's claim. *Id.*

In this case, Dr. Dowlen established a prima facie case of age discrimination. "We 'generally . . . eschew [] an overly strict formulation of the elements of a prima facie case, particularly in age discrimination cases." *Maddow v. Procter & Gamble Co.*, 107 F.3d 846, 851 (11th Cir. 1997) (citing *Jameson v. Arrow Co.*, 75 F.3d 1528, 1531 (11th Cir. 1996)).  He was sixty-three years old when he was terminated.  He was qualified to do the job.  And, he has evidence that he was temporarily and permanently replaced by a younger doctor.  Therefore, Dr. Dowlen has successfully established that a presumption of age discrimination applies.  The Miami VA successfully defeated the presumption, however, by coming forth with substantial evidence of Dr. Dowlen's professional shortcomings.  The burden is, therefore, once again on Dr. Dowlen to proffer evidence that would allow a reasonable factfinder to conclude that the hospital's allegations regarding Dr. Dowlen's performance as an

attending at the Urology Clinic are pretextual.  For the reasons that follow, Dr. Dowlen has failed to meet this burden.

### A.     *CAT'S PAW THEORY*

Dr. Dowlen argues that Dr. Vara followed Dr. Spector's recommendation without independent investigation and, therefore, was merely the cat's paw in Dr. Spector's discrimination against him.  He cites *Tucker v. Housing Authority of the Birmingham District* for the proposition that "the 'cat's paw theory' may be utilized . . . to prove 'that the discriminatory animus behind the recommendation caused the discharge . . . if the plaintiff shows that the decision maker followed the biased recommendation without independently investigating' the recommendation." *Tucker v. Hous. Auth. of the Birmingham District*, No. 06-14441, 2007 WL 1034761, at *2 (11th Cir. Apr. 5, 2007). This would show that "the recommender is using the decision maker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)).

Although Dr. Vara did state that he did not independently investigate the basis for Dr. Spector's recommendation, he did not rubber-stamp the recommendation.  Dr. Vara also stated that he requested information about Dr. Dowlen's performance from Dr. Spector .  *See* Vara EEO Aff. at 15.  Together, they reviewed a general summary of Dr. Dowlen's actions.  *Id.*  Dr. Vara requested data regarding Dr. Dowlen's productivity and the quality of his records.  *Id.*  For instance, Dr. Spector showed him two examples of Dr. Dowlen's deficient notes.  *See* Vara Dep. at 54. Furthermore, there is no evidence that Dr. Vara regularly approved Dr. Spector's requested personnel decisions, especially as it concerns the termination of the medical staff.  There was only evidence that Dr. Vara customarily hired prospective employees who were recommended to him after they

16

interviewed with the relevant department chiefs and university staff.

In *Tucker*, there was evidence that the person requesting the personnel action generally controlled the personnel decisions in her office because the decision maker regularly approved her recommendations. 2007 WL 1034761, * at 3. Here, there is no evidence that Dr. Spector generally decided who worked in surgery or in urology. There is no evidence that Dr. Vara regularly approved Dr. Spector's recommendations regarding whose employment to terminate. Thus, the Court finds that there is insufficient evidence in the record to create a genuine issue of material fact as to whether Dr. Vara rubber-stamped Dr. Spector's biased recommendation to terminate Dr. Dowlen.

### B.      DR. SPECTOR'S ALLEGED DISCRIMINATORY ANIMUS

Further undermining Dr. Dowlen's "cat's paw theory" is the lack of evidence indicating that Dr. Spector was looking to discharge the hospital's older staff. In *Tucker*, there was testimony that the person requesting the personnel action had made comments that could be taken as evincing racial animus. *Id.* The most we have here is a comment made by another doctor to Dr. Dowlen that Dr. Spector only wants young doctors and wants to get rid of the older doctors. *See* Dowlen Dep. at 165. Dr. Spector also testified at deposition that he might have told Dr. Dowlen that he was too fixed in his ways. *See* Spector Dep. at 92. Neither of these comments evince a preference for young doctors or a dislike of older ones. For example, a young person can be inflexible and an older one adaptable.[6]

_____

[6]      In *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559 (11th Cir. 1988), the Eleventh Circuit reversed a judgment notwithstanding the verdict in favor of an employer holding that the employee presented sufficient evidence at trial from which fair minded jurors could have reasonably concluded that the employer's articulated reasons for discharging the employee were merely a pretext for age discrimination. In this case, there was evidence that the General Manager stated that older employees were "set in their ways." *Id.* at 1553. Unlike here, there was also evidence that the manager in *Castle* had made additional age-specific derogatory comments about

The comment made by another doctor to Dr. Dowlen regarding Dr. Spector's desire to terminate older doctors is also an inadmissible hearsay statement.  "The general rule is that inadmissible hearsay[7] 'cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citing *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Under the Federal Rules of Evidence, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).  The statement made to Dr. Dowlen by one of his co-workers is a classic example of hearsay.  There are no hearsay exceptions that make this statement admissible.

## C.     *PROVING PRETEXT*

To prove that the employer's asserted reasons for the adverse employment action are pretextual, Dr. Dowlen must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).  Dr. Dowlen could also attempt to directly persuade the Court that a discriminatory reason more likely motived that employer to terminate him.  *Champ v. Calhoun County Emergency Mgmt. Agency*, No. 06-14364, 2007 WL 879846, at *3 (11th Cir. Mar. 26, 2007).

In this case, there is no direct evidence of discrimination.  Dr. Dowlen has not provided any

---

the older personnel.  *Id.*  Even if Dr. Spector said that Dr. Dowlen was fixed in his ways, he did not suggest that this attribute was in any way connected to his age.

[7]     By inadmissible hearsay we mean (for purposes of this opinion only) an out-of-court statement, presented for the purpose of establishing the truth of the statement's contents, that does not fall within an exception to the hearsay rule.  *See generally* Fed. R. Evid. 801-804.

statements or documents that show that Dr. Spector, Dr. Kava, or Dr. Vara (the people who were in a position to have him terminated) discriminate against older doctors at the hospital. Dr. Dowlen's only evidence that Dr. Spector discriminated against him based on his age are the two statements discussed above. For reasons already discussed, these statements are not direct evidence of age discrimination. Dr. Dowlen does not allege that Dr. Kava, the Chief of Urology, discriminated against him. He also does not directly allege that Dr. Vara discriminated against him. Dr. Vara testified, however, that he did not know Dr. Dowlen's exact age, but knew that Dr. Dowlen was slightly older than him. Presumably, Dr. Vara would not have any incentive to discriminate against someone who is approximately as old as he is.

Dr. Dowlen also fails to show weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the hospital's proffered legitimate reasons for terminating him. Most of the testimony proffered by the hospital is consistent with the testimony proffered by Dr. Dowlen. There are slight inconsistencies in the testimony, but none affect the credibility of the hospital's reasons for discharging Dr. Dowlen. For example, Dr. Vara stated that Dr. Spector had met with Dr. Dowlen in fall 2005 to discuss his low productivity and inadequate notes. Dr. Dowlen asserts that he did not meet with Dr. Spector until February 2006.[8] Taking Dr. Dowlen's testimony as true, at least four months elapsed from the time Dr. Spector brought the deficiencies to Dr. Dowlen's attention to the time he was advised that his contract would not be renewed. Dr. Dowlen's only evidence that he had improved in those four months was his testimony that his typing skills had improved, that he had told

---

[8]     Dr. Dowlen's assertion is consistent with Dr. Spector's testimony that he only became the Chief of Surgery in January or February 2006. *See* Spector Dep. at 86. By that same token, however, it appears that Dr. Spector spoke to Dr. Dowlen about the problems he observed with Dr. Dowlen's work as soon as he noticed them.

Dr. Spector that he would try to see more patients, although he did not believe he could, and that, on a handful of days, he had seen eighteen or more patients in one day, which he thinks was a result of improved scheduling.

On the other hand, the overwhelming majority of the evidence strongly indicates that most of the people who worked with Dr. Dowlen believed his performance at the hospital was poor. Many of Dr. Dowlen's admissions show that the hospital's proffered reasons are legitimate.  For example, the hospital states that Dr. Dowlen was seeing very few patients even though he had the assistance of a Physician's Assistant.  Dr. Dowlen admitted that he cancelled patient's appointments, but asserts that it was for the patient's own health.  Dr. Dowlen found, however, that generally only five patients per day fit his criteria for being seen during their scheduled appointment.  Dr. Dowlen also argues that no one ever told him that he needed to see a specific number of patients or he would be terminated.  He admitted during deposition, however, that Dr. Kava told him that, with the help of the Physician's Assistant, he should see fifteen patients per day.  *See* Dowlen Dep. at 12. Furthermore, Dr. Dowlen agreed that this was reasonable.  *Id.*  Although no one may have specifically told him that his failure to do so would result in an adverse employment action, it is reasonable to assume that the failure to meet your supervisor's expectations will result in the termination of your employment.

Dr. Dowlen argues that Dr. Spector was not aware of many of the complaints people were making about Dr. Dowlen before he terminated him.  Dr. Dowlen does not cite to any evidence that shows that Dr. Spector was not aware of the complaints that the residents, laboratory staff and nurses

were making about Dr. Dowlen.[9]  The only complaint that Dr. Dowlen can point to that was never

brought to Dr. Spector's attention is a memorandum written by the Laboratory Manager summarizing

the staff's complaints.  Simply because the memorandum was not shown to Dr. Spector does not

mean, however, that Dr. Spector was not otherwise aware of the complaints.

Dr. Dowlen argues that some of the complaints were made by people who did not work

directly with him.  For example, Jodi Rhoda complained about the numbers of patients he saw, his

notes, and his interactions with other staff.  Dr. Dowlen notes that Ms. Rhoda usually worked on the

eighth floor while he worked on the first floor.  Ms. Rhoda was the Surgical Coordinator for the

Urology Department.  In this capacity, she was in instructed to schedule ten cystoscopies per day for

Dr. Dowlen.  She testified that he cancelled or rescheduled the appointments because he did not

think the patients were ready.  Dr. Dowlen did not introduce evidence to show that Ms. Rhoda, who

scheduled the appointments in the first place, was not the person who had to reschedule the

appointments once he cancelled them.  If she was, then she would easily know how many patients

he was seeing.  Also, simply because she worked on a different floor does not mean that she did not

communicate with other urology staff members who may have complained about Dr. Dowlen.

Similarly, if she did not have occasion to look at Dr. Dowlen's notes, a co-worker may have shown

them to her.  That she worked on a different floor as Dr. Dowlen is not necessarily inconsistent with

her testimony regarding Dr. Dowlen's professional shortcomings.

Dr. Dowlen further argues that he cannot be blamed for the number of patients he saw in the

---

[9]      Dr. Dowlen does cite to Dr. Spector's deposition, but Dr. Spector only states in the
page cited that he concluded that the Physician's Assistant was seeing more patients than she should
have by reviewing notes for the months of March, April and May.  *See* Spector Dep. at 86.  This
testimony in no way supports the blanket proposition that Dr. Spector was not aware of the many
complaints that other hospital staff were making about Dr. Dowlen.

clinic because there was a backlog when he was hired that persists to this day.  As such, Dr. Dowlen

asks the Court to infer that he was not the crux of the problem and that the hospital cannot credibly

use the number of patients he saw as an excuse to terminate him.  The problem with Dr. Dowlen's

argument is that the hospital is not looking at the numbers alone, but also introduced evidence that

his practices were not conducive to reducing the backlog.  Dr. Dowlen was hired to help decrease

the backlog and increase the number of patients being seen.  If his daily practices were incompatible

with that goal, the hospital can credibly criticize his methodology as inadequate given the hospital's

problem and the reason they hired him in the first place.  Specifically, Dr. Dowlen's cancelling

appointments might reasonably be perceived by the hospital as incompatible with its goal of reducing

the number of patients awaiting services.  Dr. Dowlen's poor notes might also reasonably be

perceived by the hospital as incompatible with its goal of improving efficiency.  Had Dr. Dowlen

not cancelled appointments, taken good notes, and refrained from ordering lab work that other

hospital members believed to be excessive, then he could more credibly argue that the hospital's

focus on the number of patients waiting for services is a pretext.

## IV.  *CONCLUSION*

As Dr. Dowlen has been unable to show that the hospital's reasons for terminating him are

pretextual, the Defendant's Motion for Summary Judgment is **GRANTED**.  The Clerk of Courts

shall **CLOSE** this case.  All pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this day of October 2007.

_____
MARCIA G. COOKE
United States District Judge

22

Copies provided to:
*The Honorable Stephen T. Brown*
*All counsel of record*